**Sharon L. HIGGINS, a/k/a Sharon L. Hill, a/k/a Sharon L. Carter, a/k/a Sharon L. Thompson, a/k/a Sharon Hayes, Plaintiff in Error,**

v.

**The STATE of Oklahoma, Defendant in Error.**

**No. A–17007.**

Court of Criminal Appeals of Oklahoma.

Jan. 19, 1972.

Rehearing Denied Feb. 28, 1972.

Phil Frazier, Tulsa, for plaintiff in error.

Larry Derryberry, Atty. Gen., Fred H. Anderson, Asst. Atty. Gen., Ray Parks, Legal Intern, for defendant in error.

BUSSEY, Presiding Judge:

Sharon L. Higgins, a/k/a Sharon L. Hill, a/k/a Sharon L. Carter, a/k/a Sharon L. Thompson, a/k/a Sharon Hayes, hereinafter referred to as defendant, was charged, tried, and convicted in the District Court of Oklahoma County, Oklahoma, of Obtaining Money by Means and Use of a False and Bogus Check, After Former Conviction of a Felony; her punishment was fixed at ten (10) years imprisonment, and from said judgment and sentence, a timely appeal has been perfected to this Court.

At the trial, Joyce Ann High, a co-defendant who was presently incarcerated in the state penitentiary, testified that on April 9, 1970, she and the defendant drove to Tulsa, Oklahoma, from Wichita, Kansas, to the home of Linda Barnett, defendant's step-sister; that she took Linda Barnett's Oklahoma driver's license from her purse and put it in the defendant's purse. On the following day, April 10, she and the defendant proceeded to Oklahoma City; they went to the Liberty National Bank, whereupon she entered, with the defendant waiting outside. Joyce opened a checking account in the name of Sandra Parkins, with $50.00 being deposited to the account. She and the defendant each contributed $25.00 in establishing the account, and Joyce was issued a pad of twenty checks. They went to a motel, and both she and the defendant filled out the checks. Joyce identified State's Exhibit Number Three, a check made payable to Linda Barnett, signed by Mrs. Sandra Parkins. The defendant cashed State's Exhibit Number Three at the Trade-Mart. She and the defendant cashed approximately fifteen (15) similar checks at various stores. She identified Exhibits Four through Ten as checks that they cashed.

On cross examination, she admitted three prior felony convictions, and that she had written a letter to the defendant wherein she stated, "Get me out of jail; I know you can do it. I've got to have the money or else." (Tr. 16)

Ella Mae Barnett testified that the address and the phone number on the checks were the same as her present address and telephone number in Oklahoma City, and that she did not know the defendant.

Linda Barnett testified that on April 9, 1970, Joyce High and the defendant visited her home in Tulsa. After they left, she discovered her driver's license was missing; she had not given anybody authority to take or use her license.

Deputy Sheriff Longacre testified that he unsuccessfully attempted to serve a subpoena on a prospective state witness, Larry Dean West. Longacre was able to ascertain that West was out of state.

Case Enoch testified that he was a court reporter and transcribed the testimony given at a previous hearing by Larry Dean West. West's testimony was thereupon read to the jury. This testimony was not made a part of the Record before this Court.

Carol Pickens testified that she was employed by the Liberty National Bank, and that she opened an account for a female, checking account number 340–647–4, in the name of Sandra Parkins. She testified that State's Exhibits Three through Ten were the same account number.

Harvey Dowdy testified that he was in charge of the checking account division for the Liberty National Bank. Defendant thereupon stipulated that the bank records would reflect that the account number 340–647–4 was opened for $50.00, that approximately fifteen (15) checks were written, all over a hundred dollars, and no other deposit was made to that account.

Ernest Smith testified that he was employed as a Questioned Documents Examiner for the Oklahoma State Bureau of Investigation, and had been employed there for fourteen years. He examined a known specimen of the defendant's handwriting and compared the same with State's Exhibit Number Three. Smith was of the

opinion that the defendant endorsed State's Exhibit Number Three.

Deputy Sheriff Wright identified a fingerprint identification card taken from the defendant.

Carl Cloud testified that he was a fingerprint technician for the State Bureau of Investigation, and that he had had sixteen years experience in fingerprint identification. He testified that he compared a fingerprint found on State's Exhibit Number Four with the known fingerprint card of the defendant, and was of the opinion that they were identical.

For the defense, Rachel Fugate, the defendant's mother, testified that on April 10, 1970, she was with the defendant at her home in Wichita, Kansas, from approximately 10:30 a. m. until 2:45 p. m. that afternoon, and that the defendant was babysitting with her brother's children. She further testified that she had a phone conversation with the defendant the evening of April 10, and that she again saw the defendant the following day at her home. She testified that she had observed a letter from Joyce High, threatening that if they did not get her out of jail that she was going to involve the defendant.

The defendant testified that on April 9, she went to Tulsa to visit Linda Barnett with Joyce High. She did not have any knowledge that Joyce High had taken her step-sister's driver's license. She testified that on April 10, she was at her home in Wichita, Kansas, tending her children and a child of her brother. The only time she left her home on that date was to take the children to and from school. She denied having any connection with Joyce High in cashing the checks. She testified that she touched State's Exhibit Number Four at the time she gave a handwriting sample. She also testified that she received a letter from Joyce High threatening that if she did not get her out of jail that she would "just take me down with her." On the evening of April 10, she assisted a neighbor, Mrs. Daney, in moving. On cross examination, she admitted to prior felony convictions.

William Carter, the defendant's brother, testified that he came to Wichita on April 10, 1970, to visit his wife's grandmother, who was ill. He visited the defendant at her home from approximately 10:00 in the morning until 3:30 that afternoon, and the defendant kept his son until April 12.

Vada Daney testified that the defendant came to her home at about 5:15 the afternoon of April 10, and they discussed the defendant's helping her move. She had a telephone conversation with the defendant at 8:00 the following morning at her home.

Bill Wade testified that he was the manager of a furniture company in Wichita, Kansas. He testified that the defendant was employed by him at the furniture store, and had been employed for approximately one month. Defendant had access to cash registers and she demonstrated nothing to lead him to believe that she was other than a faithful employe. She was prompt, a good sales lady, and was trustworthy.

In rebuttal, Detective Gary Caldwell testified that he was employed as a detective for the Wichita Police Department. On September 18, 1970, he had the occasion to go to the scene of an armed robbery at a tavern on the west side of Wichita. The defendant approached him and inquired if he would like to know who had committed the robbery. She agreed to furnish him the name if he would call the District Attorney in Oklahoma City and tell him that she had spent the night with him on April 9, 1970.

Officer Henderson testified that he obtained the original checks in question from April 20 through April 28, and retained possession of the checks until he delivered them to Ernest Smith on May 1, 1970. Ernest Smith was recalled and testified that he retained possession of the checks until the Preliminary Hearing conducted on August 13, 1970.

J. W. Anthony testified that he was a liaison officer with the Oklahoma City Police Department and was present when the defendant filled out the handwriting sam-

ple. He testified that at the time the defendant filled out the "london letter" he only had photostatic copies of the checks, and not the originals.

L. L. Philson testified that he was an evidence officer in the District Attorney's office, and was present at the time the defendant filled out the "london letter." At the time the defendant was giving the handwriting specimen, only photocopies of the checks were present.

 The first proposition asserts that the trial court committed error by allowing improper rebuttal testimony outside of the scope of the case in chief, and further allowed improper rebuttal testimony which served to prejudice the jury. In the case of Clark v. State, Okl.Cr., 370 P.2d 46, the Court therein cited Bowman v. State, 82 Okl.Cr. 199, 167 P.2d 663:

> " 'In nearly every case, we find evidence introduced as rebuttal which might properly have been introduced in support of the case in chief, but this is not the sole test. The question which arises and is directed to the discretion of the trial court is whether the evidence offered in rebuttal is a rehash of the State's case in chief, or whether it pertains to some material issue which has become important because of effect of evidence introduced on behalf of defendant.' "

In the instant case, the defendant's defense was that of alibi. She testified that she was not in Oklahoma City on the day in question, and that fact was verified by several of her witnesses in Wichita. She testified that she touched State's Exhibit Four when she was filling out the handwriting specimen. We are of the opinion that Officer Caldwell's testimony that the defendant offered to tell him who had committed a crime if he would inform the District Attorney's office that she had spent the night with him on April 9, was properly admitted as tending to cast a doubt upon the defendant's alibi. We further observe that the testimony of witnesses Henderson, Smith, Anthony, and Philson were properly admitted to refute de-

fendant's explanation of how her fingerprint was found on State's Exhibit Number Four. We, therefore, find this proposition to be without merit.

 The final proposition contends that the trial court invaded the province of the jury by restricting deliberations. The Record reflects that the jury was returned to the courtroom, after having deliberated for approximately three and one-half hours, wherein the following transpired:

> "THE COURT: I take it that you haven't been able to arrive at a verdict?
>
> "JURORS: Yes, sir.
>
> "THE COURT: I'm curious to know how you stand numerically, not for or against or anything of that nature, but six to six, . . .
>
> "JUROR: Nine, two and one, Your Honor.
>
> "THE COURT: Sir?
>
> "JUROR: Nine, two and one.
>
> "THE COURT: Is there any prospect of your reaching a verdict?
>
> "JUROR: At this time I don't know.
>
> "THE COURT: I think we—Now, we can do two things. We can declare a mistrial, or we can release them until Nine o'clock in the morning and have them come back in the morning and see if they can arrive at a verdict.
>
> "MR. RYAN: Judge, may we approach the Bench on that?
>
> "(Whereupon, a conversation was had out of the hearing of the Court Reporter and the jury panel)
>
> "THE COURT: All right. Not being able to read jurors' minds, and it's a good thing that we can't, I'm interested to know if you feel that if you deliberated more this evening if you think there is any possibility that you might arrive at a verdict. Now, that is not guarantying you're going to arrive at a verdict or anything of that nature. Or, if you feel if you were released until Nine O'clock in the morning and then commenced your deliberations again in the morning

if you might be more likely to reach a verdict at that time, or whether or not you think you're hopelessly locked and you don't see any point in continuing to deliberate. How many of you feel that you ought to deliberate longer or that there's some possibility that you might arrive at a verdict if you deliberate longer this evening?

"(Several jurors raise hands)

"THE COURT: Well, I think that's enough of you that we probably ought to give you at least another hour.

"JUROR: Your Honor . . .

"THE COURT: Yes, sir?

"JUROR: I kind of hate to bring this up, but I'm supposed to be in school to take a test tonight. I think there is another one in school, too, and it starts at 5:30, so it would be cutting it pretty close, you know, anyway; and, I have two classes. But it's up to them.

"THE COURT: Why don't you take fifteen more minutes and see if you can arrive at a verdict and in the event you can't arrive at a verdict I'm going to declare a mistrial. So, I don't want to put any undue pressure on you one way or the other, but I think that you should be given at least that much more opportunity to arrive at some conclusion of this case, and if you can that would be helpful, and if you can't that's your decision to make. So, you may retire back to the jury room and see what you can come up with." (Tr. 147–149)

Defendant argues under this proposition that the trial court put undue emphasis on a hurried verdict, and placed the convenience of the two jurors who were attending school above the interest of the defendant. In Calhoun v. State, Okl.Cr., 406 P.2d 701 (1965), Judge Brett stated in the Fourth Syllabus of the Court:

"It is not improper for trial judge, after a jury has been deliberating for some time, to call them into court to ascertain whether there is reasonable probability of reaching a verdict and to inquire of the likelihood of them doing so. However, the court must exercise great caution to say nothing tending to coerce an agreement, to indicate his feelings in the case, or to invade the province of the jury."

We have previously held that the length of time a jury is required to deliberate is within the sound discretion of the trial judge, and his judgment is final, unless there is a clear abuse of his discretion. Reed v. State, Okl.Cr., 335 P.2d 932. We are of the opinion that the trial court's comments did not in any manner attempt to coerce an agreement to indicate his feelings in the case, or to invade the province of the jury. To the contrary, the trial court stated that he did not want to put undue pressure on the jury one way or the other. The trial court was within its right in making inquiry so that it might exercise its discretion in requiring additional deliberation or to discharge the jury. We, therefore, find this proposition to be without merit.

In conclusion, we observe that the Record is free of any error which would justify modification or require reversal. The judgment and sentence is affirmed.

BRETT, J., dissents.

SIMMS, J., concurs.

BRETT, Judge (dissenting):

Under these circumstances there is little doubt in my mind that the adverse jury ballots were swayed by the circumstances under which the jury was operating. The jury should have been excused until the next morning, or the court should have declared a mis-trial.